STATE v. BLACKMAN

[93 N.C. App. 207 (1989)]

STATE OF NORTH CAROLINA v. JAMES ANDREW BLACKMAN

No. 8810SC603

(Filed 21 March 1989)

### 1. Criminal Law § 75.7— no custodial interrogation—Miranda warnings not required

The trial court properly concluded that police detectives did not subject defendant to custodial interrogations, and the court consequently did not err by refusing to suppress defendant's statements on the ground that he did not receive *Miranda* warnings where defendant was free to come and go as he pleased during all interviews; he asked for and received breaks to get coffee or go to the bathroom unescorted; the detectives took pains to ask defendant on tape if anybody was forcing him to stay, and he typically responded that he had come to the station and was talking to police of his own free will; defendant, on several occasions, telephoned the detectives and, on his own, went to the police station to talk to them; none of the interview sessions were of long duration; the detectives dressed in civilian clothing; and they did not expose their weapons to defendant.

### 2. Criminal Law § 75— detectives' use of psychiatric history— detectives ingratiating themselves with defendant—no coercion of confession

Detectives' use of defendant's psychiatric history to guide their interrogative tactics and their ingratiating themselves with defendant did not constitute coercion of his confession.

### 3. Criminal Law § 75.14— mental capacity to confess

Though there was conflicting medical evidence as to defendant's mental state, his statements to detectives were not rendered involuntary by his mental condition, and defendant was legally competent to make those statements to the detectives.

APPEAL by defendant from *Barnette (Henry V.), Judge.* Judgment entered 14 January 1988 in Superior Court, WAKE County. Heard in the Court of Appeals 23 January 1989.

*Attorney General Lacy H. Thornburg, by Assistant Attorney General William P. Hart, for the State.*

*Thomas C. Manning for defendant-appellant.*

BECTON, Judge.

On 12 December 1983, a grand jury indicted defendant, James Andrew Blackman, for the murder of Helena Peyton. At the 6 August 1987 Criminal Term of the Wake County Superior Court, defendant made a motion *in limine* to suppress statements he had made to two Raleigh police detectives. In an order entered 31 August 1987, the Honorable Wiley F. Bowen, Judge, denied defendant's motion to suppress. Defendant entered a plea of guilty to second degree murder before the Honorable Henry V. Barnette, Jr., Judge, at the 14 January 1988 Criminal Term of the Wake County Superior Court. Judge Barnette sentenced defendant to life imprisonment. The State agreed that, as a condition of the plea, defendant would appeal the denial of his motion *in limine* along with his appeal of the judgment and sentence. We affirm.

I

On 28 September 1979, Helena Peyton, a student at St. Augustine's College, was stabbed to death in a sixth-floor bathroom of the women's dormitory, Latham Hall. Police investigators made a composite sketch of a man witnesses had seen leaving the building. They also recovered a blood-stained garment from woods nearby. The police, however, did not initially apprehend any suspect in the killing.

In the spring and summer of 1983, Detectives J. C. Holder and A. C. Munday of the Raleigh Police Department Major Crimes Task Force received information that defendant, James Andrew Blackman, had been making inculpatory statements about the Peyton murder. At the time they received these reports, defendant was a patient at Dorothea Dix Hospital. Holder and Munday began to investigate defendant; their inquiry included obtaining and reading defendant's voluminous psychiatric records.

When defendant left the hospital on 23 September 1983, Holder and Munday made contact with him in downtown Raleigh and told him they wanted to speak with him. On 25 October, a police officer brought defendant to the investigative division offices to meet with Holder and Munday. With defendant's permission, the detectives

tape recorded the conversation. After the interview, defendant and the detectives went to St. Augustine's College. Defendant pointed to Latham Hall and said, "That's the girls' [or girl's] dorm." In addition, defendant walked down a path into the woods where the bloodied garment had been found following the Peyton murder.

The next day, defendant came back to the police station, spoke once more with Holder and Munday, and returned with them to the college campus. Defendant took the detectives to the sixth-floor bathroom in Latham Hall, showed them the last toilet stall, and told them, "This is where it happened." He then walked to the sink, washed his hands, and said, "This is what I did."

Between 28 October and 7 December, defendant participated in eight tape-recorded conversations; seven included Holder and Munday, and one included Holder and an assistant district attorney. During these sessions, defendant, in essence, admitted killing Helena Peyton. On 7 December, Holder and Munday arrested defendant for the murder.

Concomitant with his dealings with the police, defendant received extensive psychiatric treatment. Between 21 January 1983 and 7 December 1983, defendant was hospitalized at Dorothea Dix four times. The first hospitalization ran from 21 January until 23 September, the second from 2 October until 18 October, the third from 28 October until 18 November, and the fourth from 28 November until 7 December. Defendant's psychiatric reports from this period indicate that he was twice diagnosed as suffering from atypical psychosis.

After his arrest, defendant filed a motion *in limine* to suppress the statements he had made to the detectives. Following a *voir dire* hearing, the judge denied defendant's motion. Defendant subsequently pleaded guilty to second degree murder, preserving his right to appeal the denial of his motion *in limine* as a condition of the plea. The only issue for our consideration is whether the judge should have granted defendant's motion to suppress.

## II

Defendant contends his statements were inadmissible on two grounds. First, he contends he did not make the statements knowingly and voluntarily. Stated another way, defendant alleges he was not mentally competent when he made his admissions. Second, defendant claims that he made the statements during custodial

STATE v. BLACKMAN

[93 N.C. App. 207 (1989)]

interrogations without the benefit of *Miranda* warnings. We shall first address the question of custody.

A

The State urges us to reject defendant's *Miranda* challenge on the grounds that defendant has not excepted to the judge's finding that no custodial interrogations took place prior to defendant's arrest. N.C. R. App. P. 10(a) (1988). We choose to dispose of this issue on its merits, however, because the question of custody is relevant to whether defendant made his statements knowingly and voluntarily.

A person must be fully advised of his constitutional rights before any custodial interrogation may take place. *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694 (1966); *State v. Harvey*, 78 N.C. App. 235, 237, 336 S.E. 2d 857, 859 (1985). " '[T]he only relevant inquiry' " to make in determining whether a person was in the custody of the police during interrogation " 'is [to ask] how a reasonable man in the suspect's position would have understood his situation.' " *Harvey*, 78 N.C. App. at 238, 336 S.E. 2d at 860 (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442, 82 L.Ed. 2d 317, 336 (1984) ). In short, "custody" depends upon whether a reasonable person would have believed he was free to leave the company of the police. *See State v. Davis*, 305 N.C. 400, 410, 290 S.E. 2d 574, 580-81 (1982) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554, 64 L.Ed. 2d 497, 509 (1980) ). *Miranda* warnings are not required simply because questioning takes place at the police station, or because the questioned person is a suspect. *Oregon v. Mathiason*, 429 U.S. 492, 495, 50 L.Ed. 2d 714, 719 (1977); *see also State v. Perry*, 298 N.C. 502, 509, 259 S.E. 2d 496, 500-01 (1979).

[1] The judge concluded as a matter of law that Holder and Munday never subjected defendant to a custodial interrogation prior to his arrest. The judge based this conclusion on his finding of fact that "[d]uring all interviews [d]efendant was free to come and go as he pleased and asked for and received breaks to get coffee or go to the bathroom unescorted." The detectives took pains, moreover, to ask defendant, on tape, such questions as "Nobody is forcing you to stay here, [are] they?" Defendant typically answered that he had come to the station and was talking to the police "on [his] own will." Defendant, on several occasions, telephoned Holder and Munday and, on his own, came to the station to talk with them. Moreover, the judge found that none of the interview

sessions was of long duration, that Holder and Munday dressed in civilian clothing, and that they did not expose their weapons to defendant. In our view, a reasonable person in defendant's position would not have believed he was in police custody. The judge correctly concluded, therefore, that the detectives did not subject defendant to custodial interrogations. Consequently, the judge did not err by refusing to suppress the statements on the ground that defendant did not receive *Miranda* warnings. We overrule this assignment of error.

B

Defendant also contends that he was not mentally competent on the occasions he spoke to Holder and Munday and that his incriminating statements, therefore, should have been suppressed. *See Blackburn v. Alabama*, 361 U.S. 199, 4 L.Ed. 2d 242 (1960); *State v. Ross*, 297 N.C. 137, 141, 254 S.E. 2d 10, 12 (1979). Defendant argues that his lack of competence rendered his admissions "involuntary" under the due process clause of the fourteenth amendment. We begin by noting that, absent police coercion, there is no federal due process ground for finding that a confession is involuntary. *Colorado v. Connelly*, 479 U.S. 157, 167, 93 L.Ed. 2d 473, 484 (1986); *State v. Adams*, 85 N.C. App. 200, 203, 354 S.E. 2d 338, 340 (1987). Rather, the admissibility of an uncoerced statement must be determined by state rules of evidence. *Connelly*, 479 U.S. at 159, 93 L.Ed. 2d at 479; *Adams*, 85 N.C. App. at 203, 354 S.E. 2d at 340.

[2] Defendant asserts that Holder and Munday's use of his psychiatric history to guide their interrogative tactics constituted coercion. We reject this contention. Holder and Munday clearly ingratiated themselves with defendant and presented themselves as his friends. We are not prepared to hold, however, that simply because the police adopt a strategy for their dealings with a suspect that that strategy is therefore coercive. At no time did these detectives force defendant to submit to any of the ordeals traditionally associated with coercive interrogations. *See, e.g., Blackburn*, 361 U.S. at 207-08, 4 L.Ed. 2d at 249 (suspect interrogated for eight to nine hours in a tiny room). We hold, therefore, that the interviews in which defendant participated with Holder and Munday were not coercive, and thus, we look to our state rules to decide whether the judge should have suppressed defendant's statements

STATE v. BLACKMAN

[93 N.C. App. 207 (1989)]

on the ground that defendant was incompetent. *Adams*, 85 N.C. App. at 203, 354 S.E. 2d at 340.

[3] To determine whether a defendant was or was not competent at the time he incriminated himself, this court must look at the totality of the circumstances surrounding the defendant and his admissions. *Ross*, 297 N.C. at 141, 254 S.E. 2d at 12. A critical stricture on our inquiry is that the findings of fact made by the trial judge at the *voir dire* hearing are conclusive and binding upon us if those findings are supported by competent evidence in the record. *State v. Simpson*, 314 N.C. 359, 368, 334 S.E. 2d 53, 59 (1985).

We have already determined that defendant was not in police custody at the time he made his admissions, and that Holder and Munday did not coerce defendant into making the statements he did. We now turn our examination to the medical evidence in this case. That evidence indicated that defendant has never had a sound mental state. The evidence conflicted, however, as to the severity of defendant's disorder. Indeed, the evidence conflicted as to the nature of the illness, or illnesses, from which defendant has suffered.

Dr. Walter Scarborough, Jr., a psychiatrist, reviewed defendant's medical records, read the transcript of defendant's conversations with Holder and Munday, and interviewed defendant prior to the suppression hearing. Dr. Scarborough testified that defendant was "at least psychotic during [the period of time in which defendant associated with the detectives], if not psychotic all the time." Dr. Scarborough's opinion is buttressed, in part, by the two diagnoses of atypical psychosis made in late 1983.

Dr. Bob Rollins, a forensic psychiatrist and Clinical Director of the Forensic Unit at Dorothea Dix, testified for the State. His diagnosis was that defendant had a mixed personality disorder with primitive, antisocial and aggressive characteristics. Dr. Rollins also believed that other psychiatrists had misdiagnosed defendant as being psychotic and/or schizophrenic because defendant was a skilled malingerer. He offered the following opinion of defendant's condition during the period in which defendant dealt with Holder and Munday:

> I don't believe Mr. Blackman had a mental disorder at that time that would keep him from being competent to execute other functions. It is fair to say that Mr. Blackman is

a very limited individual and he could be easily influenced, suggestible, respond to offers of help. But all that aside, it's still my assessment that he would be competent to know what he was doing at that time.

Dr. Rollins' opinion is also supported by evidence in the record. The judge found Dr. Rollins' opinion to be "the better reasoned, [and] more consistent with the behavior and history of the [d]efendant than any opinion that [defendant] is psychotic."

In our view, some of the medical and other evidence in this case would support a conclusion that this defendant was not competent when he spoke with the detectives. At the same time, other competent evidence in the record points to the opposite conclusion. Conflicting evidence does not vitiate the conclusive and binding effect of the trial judge's findings on the appellate court. *See id.* The judge's finding that Dr. Rollins' opinion best identifies defendant's mental condition during the period in which he made his admissions to the police is supported by competent evidence in the record. We accept that finding as binding upon us. While we are not bound by the judge's conclusion that defendant was legally competent, we believe the findings do provide a sufficient basis for the judge's ruling. *See id.* We hold, therefore, that defendant's statements were not rendered involuntary by his mental condition and that defendant was legally competent to make those statements to the police detectives. Thus, we overrule this assignment of error.

### III

We find no error in the trial judge's denial of defendant's motion *in limine* to suppress the statements defendant made to Detectives Holder and Munday. Consequently, the judgment in this case is

Affirmed.

Judges WELLS and JOHNSON concur.